# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF DOROTHY KUBACKI, by
EUGENE KUBACKI, Personal Representative,

        Plaintiff-Appellee,

v

KIEN TRAN, D.O., JOAN CRAWFORD, D.O.,
and EASTLAKE CARDIOVASCULAR, P.C.,

        Defendants,

and

ST. JOHN MACOMB OAKLAND HOSPITAL,

        Defendant-Appellant.

UNPUBLISHED
June 11, 2015

No. 319821
Oakland Circuit Court
LC No. 2011-117424-NH

Before: STEPHENS, P.J., and BORRELLO and GADOLA, JJ.

PER CURIAM.

In this medical malpractice case, defendant St. John Macomb Oakland Hospital (St. John) appeals as of right from the judgment awarding plaintiff $635,177.11, entered following a jury verdict, and from the trial court's post-judgment order denying defendant's motions for judgment notwithstanding the verdict (JNOV), a new trial, or remittitur. We reverse the lower court's denial of defendant's motion for JNOV, vacate the judgment in favor of plaintiff, and remand for entry of a judgment of no cause of action in favor of St. John because legally insufficient evidence supported the jury's verdict.

## I. BACKGROUND

In 2011, plaintiff filed a complaint asserting medical malpractice claims against defendants, St. John, Kien Tran, D.O., Joan Crawford, D.O., and Eastlake Cardiovascular, P.C. This case involves numerous allegations of professional negligence, which plaintiff asserts occurred between September 6, 2008, when decedent, Dorothy Kubacki, was admitted to St. John as an inpatient, and September 9, 2008, when she died of a cardiac event. On September 6, 2008, Kubacki, a 49-year-old married woman with a history of hypertension and hyperlipidemia, presented to the St. John emergency room complaining of chest and back pain. Hospital staff

-1-

performed an EKG and discovered abnormal results, and an emergency room physician diagnosed Kubacki with acute unstable angina. Kubacki was then admitted as an inpatient at St. John. During her hospitalization, Dr. Tran, an internal medicine doctor, acted as Kubacki's attending physician. Dr. Crawford, a cardiologist, also treated Kubacki during her hospital stay.

Following trial, a jury determined that St. John was professionally negligent and that its negligence proximately caused Kubacki's injuries and death. The jury found no professional negligence on the part of Dr. Crawford or Eastlake Cardiovascular, P.C., and the trial court entered a judgment of no cause of action with respect to these defendants. The parties dismissed Dr. Tran by stipulation at the beginning of trial. After awarding case evaluation sanctions, the trial court entered a judgment of $635,177.11 in favor of plaintiff against St. John. St. John filed motions for JNOV, or, in the alternative, a new trial or remittitur. Following a hearing on the matter, the trial court denied St. John's motions.

## II. STANDARD OF REVIEW

We review a trial court's decision on a motion for JNOV de novo. *Genna v Jackson*, 286 Mich App 413, 417; 781 NW2d 124 (2009). In reviewing the denial of such a motion, we view the evidence and all legitimate inferences arising therefrom in a light most favorable to the nonmoving party to determine whether the moving party was entitled to judgment as a matter of law. *Id*. A court should grant a motion for JNOV only "when there is insufficient evidence presented to create a triable issue for the jury." *Id.* If reasonable jurors could reach different conclusions regarding the evidence presented at trial, a jury's verdict must stand. *Nelson v Dubose*, 291 Mich App 496, 499; 806 NW2d 333 (2011).

## III. PROXIMATE CAUSATION

On appeal, St. John argues that the trial court erred in denying its motion for JNOV. Specifically, St. John contends that plaintiff failed to present sufficient evidence from which reasonable jurors could conclude that any breach of the applicable standards of care by St. John or its employees proximately caused decedent's injuries or death. We agree.

"In a medical malpractice case, the plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995). "Failure to prove any one of these elements is fatal." *Id.* " 'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). A jury must first find that a defendant's negligence was the cause in fact of a plaintiff's injuries before it may deem the defendant's conduct a proximate or legal cause of those injuries. *Id.* at 87. "Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission." *Id.*

A plaintiff need not show that a defendant's conduct was the *sole* catalyst for an injury, but must produce sufficient evidence to permit a jury to conclude that the conduct was *a* cause. *Craig*, 471 Mich at 87. Moreover, a plaintiff must demonstrate more than a mere possibility or a plausible explanation of a causal theory. *Id.* A valid theory of causation must be based on

specific facts in evidence that would support reasonable inferences of cause and effect. *Id*. Although the evidence need not negate all other possible causes, the evidence must "exclude other reasonable hypotheses with a fair amount of certainty." *Id*. at 87-88 (citations and quotation marks omitted). "Where the connection between the defendant's negligent conduct and the plaintiff's injuries is entirely speculative, the plaintiff cannot establish a prima facie case of negligence." *Id*. at 93. In a medical malpractice case, "[e]xpert testimony is required to establish the standard of care and a breach of that standard, as well as causation." *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012) (citations omitted).

In this case, plaintiff's theory was that St. John and its staff, including its nurses and an intern, breached standards of care and proximately caused Kubacki's injuries or death because the breaches delayed Dr. Crawford's performance of a cardiac catheterization that would have led to the discovery of a partial occlusion of Kubacki's left anterior descending (LAD) artery and to the surgical placement of a stent before Kubacki's fatal cardiac event at 2:35 a.m. on September 9, 2008. We agree with St. John that plaintiff failed to present sufficient evidence to demonstrate that St. John or its employees breached the applicable standards of care and that those breaches proximately caused Kubacki's injuries or death. We will address each of plaintiff's theories of liability in turn.

## A. THE MIDNIGHT EKG

Plaintiff's first theory of liability is that St. John's staff, including its nurses and intern, Dr. Bradley Ayman, failed to properly read and report the abnormal results of an EKG performed on Kubacki at 12:28 a.m. on September 8 (the midnight EKG) to a more qualified physician, such as Dr. Tran or Dr. Crawford. Plaintiff's expert cardiologist, Dr. Arthur Levene, testified that the midnight EKG was profoundly different than the EKG taken on September 6 when Kubacki was first admitted at St. John, and that the midnight EKG suggested that "this is a cardiac situation." No one on St. John's staff called Dr. Tran or Dr. Crawford about the results of the midnight EKG, but according to Dr. Levene, someone should have called. Plaintiff's expert nurse, Sharon VanRiper, testified that the nurses and the intern should have called the physicians above them to report the significant changes in the midnight EKG. VanRiper claimed that the intern, Dr. Ayman, "didn't know what he was doing" when he read the EKG and an experienced nurse should have said, "hey, I don't like this, this is different." VanRiper asserted that St. John should have had a system in place to make Dr. Ayman aware that he needed to call a more experienced physician, such as Dr. Tran or Dr. Crawford.

Assuming that plaintiff established a breach of the applicable standards of care on the part of Dr. Ayman and the nurses in failing to properly read and report the results of the midnight EKG, plaintiff presented no specific facts establishing a causal connection between this alleged breach and Kubacki's injuries or death. Although Dr. Ayman and the nurses did not contact Dr. Crawford or Dr. Tran immediately, Dr. Crawford examined the midnight EKG the next morning and reviewed the results. Dr. Crawford concluded that the results of the midnight EKG were abnormal, showed changes from the earlier EKG, and suggested the possibility that Kubacki was suffering from ischemia. However, Dr. Crawford testified that although the results required further investigation, in her opinion, the results did not mandate that Kubacki undergo a cardiac catheterization. Dr. Crawford testified that the midnight EKG had no effect on the outcome of the case, and that "[t]here was nothing alarming about that EKG."

Further, although plaintiff's expert cardiologist, Dr. Levene, testified that the midnight EKG suggested "a cardiac situation" and opined that Dr. Tran or Dr. Crawford should have been called after it was taken, Dr. Levene testified that, in his opinion, a catheterization was not required immediately after the midnight EKG because Kubacki's pain went away at that point. Rather, Dr. Levene testified that a cardiac catheterization should have been performed in the afternoon of September 8 when Kubacki developed reoccurring chest pain. There are no facts establishing that informing Dr. Crawford or Dr. Tran sooner about the results of the midnight EKG would have altered the course of treatment in this case. Dr. Crawford's testimony reflects that she did not believe a catheterization was required after reviewing the results of the midnight EKG, and plaintiff's own expert cardiologist indicated that a catheterization was not needed until the afternoon of September 8 when Kubacki developed recurrent chest pain. Accordingly, plaintiff did not present any specific facts demonstrating a causal connection between the hospital staff's failure to properly read or report the midnight EKG and any delay in the performance of a cardiac catheterization.

## B. ST. JOHN'S TRANSFER POLICIES

Plaintiff's second theory of liability is that St. John failed to implement a proper policy or procedure to effectuate patient transfers to another medical facility with a 24-hour catheterization lab if a physician ordered a catheterization when St. John's lab was closed. There is no evidence in the record establishing either a breach of the standard of care or causation with respect to this theory of liability. Plaintiff's expert nurse, VanRiper, testified that St. John needed policies or procedures to move a patient to another hospital if the catheterization lab was not available at St. John. VanRiper testified that she was unaware of any such policies or procedures, and said that she had not seen such procedures at St. John. VanRiper acknowledged that only doctors had the authority to order the transfer of a patient. At trial, Dr. Crawford testified that although cardiac catheterizations were not done at St. John on weekends or after regular business hours, a patient could be transferred promptly to another hospital if such a catheterization was needed on an emergency basis.

VanRiper's testimony reflects that she was unaware whether St. John had a policy for transferring patients to another facility upon a physician's order to perform a catheterization after St. John's catheterization lab had closed. Accordingly, there is no basis in evidence to conclude that St. John lacked such a policy or procedure. Nor was there any evidence produced at trial to dispute Dr. Crawford's testimony that a patient *could* be transferred promptly to another hospital if a catheterization was needed on an emergency basis. Therefore, plaintiff has not established a breach of the standard of care on this theory of liability. Nor was there any evidence presented at trial that any alleged breach of the standard of care proximately caused Kubacki's injuries or death. VanRiper conceded that only a doctor, not a nurse, had the authority to transfer a patient. There was no evidence that any physician ever ordered a transfer of Kubacki to another facility, or that St. John's purported failure to implement sufficient transfer policies delayed or precluded a transfer in this case. This theory of liability was therefore unsupported at trial.

## C. COMPLETION OF THE AFTERNOON EKG

Next, plaintiff asserts that St. John's nurses failed to ensure the completion of an EKG Dr. Crawford ordered late in the afternoon on September 8, and therefore breached the applicable

standard of care. Assuming that the failure to ensure completion of this EKG constituted a breach, plaintiff presented nothing more than speculation to conclude that any breach was causally connected to Kubacki's injuries or death. Dr. Crawford testified that she ordered an EKG at around 3:45 p.m. on September 8, and that a nurse later called her and said that Kubacki could not undergo the EKG because she was vomiting. Dr. Crawford testified that she "hoped [the EKG] was going to be done, but at the same time, [Kubacki] now said she was wanting to leave." Dr. Crawford did not instruct the nurse to go back and see if she could perform the EKG at a later time. The hospital notes showed that Kubacki refused the EKG at 4:50 p.m. because she was vomiting and burping. According to medical notes, Kubacki asked the medical personnel administering the EKG to come back later.

Anicia Lucas, a St. John nurse who came on duty at 7:00 p.m. on September 8, testified that she did not try to administer the EKG that was ordered by Dr. Crawford earlier in the day because Kubacki was not having chest pain and was still nauseated and vomiting. Lucas testified that from the time she came on duty at 7:00 p.m., Kubacki had continued complaints of nausea, gagging, or back pain, or she was crying. According to hospital notes, after receiving anti-nausea medication, Kubacki was sleeping at 9:00 p.m., but at approximately 10:30 p.m., Kubacki was awake and sitting in a chair gagging again and trying to throw up.

At trial, plaintiff's expert nurse witness, VanRiper, testified that the EKG ordered by Dr. Crawford should have been administered. According to VanRiper, it was reasonable for the EKG technician to give Kubacki "a little bit of space to finish vomiting," but the nurses should have made sure that the technician came back to finish the EKG. VanRiper claimed that the failure to ensure the completion of the EKG deprived Dr. Crawford of information needed to make further decisions about Kubacki's care.

However, even if the St. John's nurses breached the applicable standard of care, plaintiff presented no evidence demonstrating that the failure to ensure the completion of the EKG proximately caused Kubacki's injuries or death. There are no facts establishing that Kubacki would have agreed to undergo the EKG at any point during the evening of September 8. Kubacki remained nauseous and continued trying to vomit throughout the night. It is therefore speculative to assert that Kubacki would have agreed to undergo the EKG and that St. John's staff would have been able to complete the procedure. Further, even if the EKG could have been performed, there are no specific facts establishing that the results of the EKG would have led Dr. Crawford to order the transfer of Kubacki to another hospital for an emergency cardiac catheterization, that Dr. Crawford would have then decided to perform an emergency surgery to address Kubacki's partially occluded artery, and that all of this would have occurred before Kubacki's fatal cardiac event at 2:35 a.m. on September 9. Plaintiff has therefore failed to establish legally sufficient causation with respect to this theory of liability.

## D. FAILURE TO INFORM PHYSICIANS OF CONTINUING SYMPTOMS

Finally, plaintiff contends that St. John's nurses breached the standard of care by failing to inform Dr. Crawford of Kubacki's continuing symptoms during the evening hours of September 8. Lucas testified that during the evening of September 8, Kubacki complained of nausea, back pain, and an inability to sleep. Lucas did not call Dr. Tran or Dr. Crawford, but instead notified the house officer. Lucas testified that she did not call Dr. Tran about Kubacki's

8:00 p.m. report of back pain because he had just been there, and Kubacki's back pain was not a new symptom. After receiving anti-nausea medication, Kubacki was sleeping at 9:00 p.m. At approximately 10:30 p.m., Kubacki was awake and sitting in a chair gagging and trying to throw up. Lucas testified that she did not call Dr. Tran, Dr. Crawford, or the house officer at that point. According to Lucas, at midnight, Kubacki fell asleep again.

Dr. Crawford testified that, according to Kubacki's chart, she had nausea, back pain, and difficulty sleeping during the late evening hours of September 8. No one called Dr. Crawford to notify her of these ongoing symptoms, but Dr. Crawford stated that Kubacki's discomfort had been going on all day. Dr. Crawford agreed that the hospital staff had an obligation to call her or Dr. Tran about signs and symptoms that could be evidence of ischemia. In response to a hypothetical question about whether she would have taken steps to do something to save a patient who had symptoms of a partially or fully occluded cardiac vessel, Dr. Crawford answered, "Hypothetically, yes."

Plaintiff presented no expert testimony to establish that St. John's nurses breached the standard of care in failing to call Dr. Crawford or Dr. Tran about Kubacki's ongoing symptoms.[1] VanRiper, the only nurse who testified as an expert, did not testify that these alleged omissions on the part of St. John's nurses breached an applicable standard of care. Moreover, even if a breach did occur, there was no testimony establishing a causal connection between the breach Kubacki's injuries or death. Again, Dr. Crawford stated that although no one notified her about these ongoing conditions in the late evening hours, Kubacki's discomfort had been going on all day. Dr. Crawford was aware that Kubacki had been vomiting when she initially refused the EKG. Dr. Crawford was also aware of Kubacki's discomfort and belching because Kubacki complained about these conditions and made unusual belching sounds with almost every breath when Dr. Crawford saw her the afternoon of September 8. It is speculative to assert that, if St. John's staff had notified Dr. Crawford of Kubacki's continuing symptoms during the late evening hours of September 8, Dr. Crawford would have decided to transfer Kubacki to another hospital, performed a cardiac catheterization, and then performed an emergency surgery to place a stent, and that all of this would have occurred in time to prevent Kubacki's fatal cardiac event at 2:35 a.m. on September 9. Plaintiff has therefore failed to establish either a breach or causation with respect to this theory of liability.

## IV. CONCLUSION

For the reasons stated above, we conclude that the trial court erred in denying St. John's motion for JNOV. Plaintiff failed to present sufficient evidence from which reasonable jurors could find that any breach of the applicable standards of care by St. John or its employees proximately caused Kubacki's injuries or death. In light of our resolution of this issue, we need not address the other issues raised by the parties on appeal.

---

[1] Although Dr. Crawford testified that the nurses were obligated to call her or Dr. Tran about Kubacki's symptoms that could be evidence of ischemia, Dr. Crawford was not qualified at trial as an expert on the standard of care applicable to nurses.

The lower court's order denying defendant's motion for JNOV is reversed, the judgment in favor of plaintiff is vacated, and the case is remanded for entry of a judgment of no cause of action in favor of St. John because legally insufficient evidence supported the jury's verdict at trial. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Stephen L. Borrello
/s/ Michael F. Gadola