# STATE OF MICHIGAN

# COURT OF APPEALS

JEANNE STARR ENTERPRISES, INC. and
JEANNE STARR GATER

Plaintiffs/Counter-Defendants-
Appellants,

v

MARVIN TOWNS,

Defendant/Counter-Plaintiff-
Appellee.

UNPUBLISHED
March 1, 2018

No.  333188
Wayne Circuit Court
LC No.  13-016468-CB

Before:  JANSEN, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

Plaintiffs, Jeanne Starr Gater (Gater) and Jeanne Starr Enterprises, Inc. (Enterprises), appeal as of right the trial court's order of dismissal, which was entered after the jury returned a unanimous no cause verdict in favor of defendant, Marvin Towns.  On appeal, plaintiffs challenge the trial court's evidentiary rulings during the trial, as well as the March 16, 2015 default judgment entered against plaintiffs on defendant's countercomplaint.  We affirm.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

This action arises out of a dispute between Gater, a book author, and defendant, the movie producer she hired to bring her written story to the big screen.  In 1985, plaintiff wrote her memoir:  Bring Back Summertime.  The faith-based book recounted the trials and triumphs experienced by Gater and her family after Gater's husband, Dr. Julius Gater, was critically injured in a motor vehicle accident.  After the book was published and received favorable reviews, Gater was encouraged to make her book into a movie.

Gater wrote a screenplay based on her book, which was awarded the "Dove Seal of Approval," and in June 2013 she applied for film incentives through the Michigan Film Office ("MFO").  Pursuant to the terms of the MFO program, a recipient of an incentive would be given notice of the award, but would only be given the actual incentive after the film was completed and an audit certified that the film was produced in accordance with the program's criteria.  At the time of applying for the incentive, an applicant was required to establish that it had 80 percent of the film project budget already funded.  During the MFO review process, Gater was

-1-

asked to revise her film budget to bring it into compliance with the program. Gater did so, and was awarded a prospective incentive in the amount of $676,000.

During this time, Gater began her search for a movie producer. Based on the recommendations of a business acquaintance, she contacted defendant, Marvin Towns. In August 2013, Gater and defendant entered into a contract which provided that defendant would produce Bring Back Summertime. As the producer, defendant would be responsible for, among other things, opening a production office and establishing payroll for the cast and crew.

Plaintiffs opened a bank account in Michigan, of which Gater and defendant were both signatories. Gater deposited approximately $70,000 into the account in anticipation of production starting. Initially, John Butler from BankSouth agreed to financially underwrite part of the film budget. However, after the award from the MFO was granted, Butler backed out of the deal. Also during this time, plaintiff was actively searching for new investors and using her own credit cards to fund the day-to-day pre-production operations.

Production of the film began on September 4, 2013. On September 7, 2013, plaintiff, a Georgia resident, flew to Detroit. A table reading of the script was scheduled for September 10, 2013. On September 13, 2013, defendant abruptly stopped production without plaintiffs' permission. On September 14, 2013, Gater had the first opportunity to view online the bank account activity. It was then that she discovered that the account had a negative balance of 9.07. Gater terminated defendant as producer on September 16, 2013.

On September 19, 2013, Gater held a production meeting with several film crew members. Later that day, defendant sent an e-mail to two individuals at the MFO and one individual at the Screen Actors' Guild ("SAG"). The e-mail contained the following statements:

> Selam,
>
> Her financing was never real.
>
> We were all duped into thinking that her film was funded and now 54 crew member [sic] and 4 principal actors would have been stranded in Michigan had I not smelled a rat last week.
>
> The majority of the crew has already retained legal council [sic] and my management team and my agent are filing suit tomorrow.
>
> Selam, I think that she filed her MFO app under fraudulent circumstances and with Doctored paper work.
>
> I can't prove it now but me [sic] legal team will uncover every rotten stone regarding this project.
>
> Absolutely nothing against the MFO, you all have always been good to me, but Jeanne owes me a lot of money and I intend to collect what's owed me and the crew.

Marvin

Defendant also forwarded a copy of this e-mail to line producer George Hicks who then forwarded the e-mail to plaintiff's attention.

On December 26, 2013, plaintiffs initiated this action against defendant, alleging claims of tortious inference with plaintiffs' contractual relationship with the MFO, business and individual defamation, breach of contract, intentional and negligent infliction of emotional distress, claim and delivery, conversion, and fraud, silent fraud, and misrepresentation.

On July 1, 2014, defendant filed an amended answer to plaintiffs' complaint, along with affirmative defenses, a demand for a reply to all affirmative defenses, and a countercomplaint. The coun025-complaint alleged that plaintiffs were unable to continue the film project because they failed to obtain the necessary funding. Defendant further alleged that plaintiffs agreed to pay him $82,000 in exchange for his services as producer on the film project, but failed to compensate him consistent with the terms of their agreement. Defendant's countercomplaint asserted claims for breach of contract, unjust enrichment, tortious interference with a business relationship, fraud, and misrepresentation. Defendant used the trial court's e-filing system to file and serve the amended answer and countercomplaint on plaintiffs. After 21 days had elapsed and plaintiffs failed to answer the countercomplaint, defendant filed a request for entry of a default against plaintiffs. A default was then entered and, on that same day, a default judgment was also entered in the amount of $145,750.

Plaintiffs moved to set aside the default judgment. Plaintiffs claimed that they were never served with defendant's amended pleadings, including the countercomplaint. Plaintiffs further asserted that the default judgment was procedurally defective because defendant failed to provide seven days' notice before entry of the default judgment as required by MCR 2.603(B)(1)(b). Plaintiffs asserted that these irregularities constituted good cause to set aside the default judgment. Plaintiffs also submitted an affidavit from their attorney who averred that plaintiffs had a meritorious defense to the claims in the countercomplaint. The trial court granted plaintiffs' motion to set aside the default judgment, but denied the request to set aside the initial default. The court noted that defendant had submitted computer-generated documentation showing that someone with access to plaintiffs' counsel's e-mail had opened the e-mail containing defendant's countercomplaint on July 1, 2014, within several minutes after it was electronically served. The court did conclude, however, that after the default was properly entered, defendant failed to comply with MCR 2.603(B)(1)(b) because he did not provide plaintiffs with seven days' notice before seeking the default judgment. Accordingly, the $145,000 default judgment in defendant's favor was set aside.

Defendant subsequently filed a motion for entry of a default judgment, this time providing the requisite seven days' notice. Defendant submitted several affidavits in support of his requested contractual damages and attorney fees. The trial court granted defendant's motion

and thereafter entered a default judgment in defendant's favor in the amount of $106,931.35.[1] Additionally, the trial court dismissed plaintiffs' contractual, intentional and negligent infliction of emotional distress, fraud, silent fraud, and misrepresentation claims. Plaintiffs' claims for business defamation, individual defamation, claim and delivery, and conversion survived.

At trial, after plaintiffs rested their case-in-chief, the trial court granted defendant's motion for directed verdict on plaintiffs' conversion and claim and delivery claims. The trial court found that plaintiffs had failed to present evidence that defendant had possessed or controlled plaintiffs' personal property at any time, or misappropriated or withdrew funds from the corporate bank account that were used for something other than movie-related expenses. With respect to plaintiffs' defamation claims, the trial court determined that the jury would not be permitted to consider whether statements alleging that plaintiffs did not pay the crew's hotel bills and did not have a welfare instructor on the set were defamatory because there was no evidence that defendant made these statements. However, the trial court found that there existed a question of fact with respect to whether the statements made by defendant in the September 19, 2013 e-mail sent to the MFO and SAG were defamatory.

During his case-in-chief, defendant called several witnesses, and testified on his own behalf. Defendant explained that he had been a movie producer and director since 1980. When he arrived at the production offices for Bring Back Summertime, a budget was already in place. Defendant had cashier's checks issued out of the corporate account to pay the crew because they had no payroll set up and he knew that cashier's checks would be guaranteed. Very early on, however, defendant learned that there was not going to be adequate financing for the film.

In rebuttal, plaintiff explained that after she submitted the initial application to the MFO, the MFO requested that she make changes to the film budget. However, at the time she submitted her application to the MFO on June 19, 2013, the project had the requisite funding and the application was accurate.

The jury returned a verdict in defendant's favor. It found that defendant did not make a defamatory statement about plaintiffs. This appeal followed.

II. DEFAULT JUDGMENT

Plaintiffs first argue that the trial court abused its discretion by failing to set aside the default, and thereafter erroneously entered a default judgment in favor of defendant on his counterclaims. We disagree.

This Court reviews a trial court's refusal to set aside a default or default judgment for an abuse of discretion. *Amco Builders & Dev, Inc v Team Ace Joint Venture*, 469 Mich 90, 94; 666 NW2d 623 (2003). An abuse of discretion occurs when the court's decision falls outside the range of principled outcomes. *Corporan v Henton*, 282 Mich App 599, 605-606; 766 NW2d 903

---

[1] This sum represented $88,000 that defendant was guaranteed under his contract with plaintiffs, less $6,000 previously paid, plus $24,931.35 in attorney fees and costs.

(2009). "[A]lthough the law favors the determination of claims on the merits, it has also been said that the policy of this state is generally against setting aside defaults and default judgments that have been properly entered." *Aiken-Ziegler, Inc v Waterbury Headers Corp,* 461 Mich 219, 229; 600 NW2d 638 (1999) (citations and footnotes omitted).

MCR 2.603 governs the entry of defaults and default judgments. MCR 2.603(A)(1) provides that if a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and this fact is established by affidavit, the clerk must enter the default of that party. A motion to set aside a default may be granted only if good cause is shown and an affidavit of facts showing a meritorious defense is filed. MCR 2.603(D); *Huggins v Bohman*, 228 Mich App 84, 87; 578 NW2d 326 (1998). "Good cause" and a "meritorious defense" are separate requirements that may not be blurred, both must be established. *Huntington Nat'l Bank v Ristich,* 292 Mich App 376, 390; 808 NW2d 511 (2011) (citation omitted). The "good cause" requirement may be established by a showing of "(1) a substantial defect or irregularity in the proceeding upon which the default was based, or (2) a reasonable excuse for failure to comply with the requirements which created the default. . . ." *Amco Builders & Developers, Inc*, 469 Mich at 95.

In this case, defendant filed and served his countercomplaint on July 1, 2014. Plaintiffs had 21 days to answer or otherwise respond. MCR 2.108(A). When no answer had been filed by July 22, 2014, defendant requested entry of a default and the court clerk properly entered a default on July 23, 2014, pursuant to MCR 2.603(A)(1). Thereafter, the trial court did not abuse its discretion when it refused to set aside the default.

Plaintiffs argued below that good cause was shown for their failure to answer the countercomplaint: they were never served with a copy of the pleading. However, the court reviewed its own e-filing system and confirmed that the countercomplaint was properly e-served on plaintiffs' counsel. Indeed, documentation provided by defendant confirmed that someone with access to plaintiffs' counsel's e-mail received and opened the e-filed countercomplaint. Therefore, plaintiffs failed to establish any irregularity in the proceeding on which the default was based or a reasonable excuse for failing to comply with the requirements that created the default, i.e., the timely filing of an answer to the countercomplaint.

Further, in support of their motion to set aside the default, plaintiffs argued that they could establish a meritorious defense. MCR 2.603(D)(1) specifically requires the filing of an "affidavit *of facts* showing a meritorious defense." (Emphasis added.) Plaintiffs submitted only an affidavit from their attorney, who simply stated:

11.     Plaintiffs have meritorious defenses to Counterplaintiff's counterclaims.

12.     Plaintiffs assert that Defendant failed to perform under the contract and is therefore, not entitled to the relief he seeks.

13.     Plaintiffs have admissible evidence to support their defenses to Defendant's counterclaims.

This affidavit was insufficient to support a meritorious defense.

MCR 2.603(D) contemplates an affidavit offered by an affiant who has personal knowledge of the facts, is able to state admissible facts with particularity, and demonstrates that he or she can testify competently to the facts set forth in the affidavit. *Huntington Nat'l Bank,* 292 Mich App at 392 (citation omitted.) Plaintiffs' counsel signed the affidavit filed with the trial court. Not only are the statements in the affidavit unsupported assertions, but plaintiffs' counsel did not have *personal knowledge* of any of the facts that would support a meritorious defense, and she would have been unable to testify to any relevant events. Because plaintiffs filed an affidavit of a meritorious defense that was woefully inadequate, plaintiffs failed to show a meritorious defense that would warrant setting aside the entry of the default.

Plaintiffs also appear to suggest that the trial court committed error requiring reversal by entering the default judgment. However, plaintiffs have failed to persuasively demonstrate an abuse of discretion in this regard. There were, in fact, two default judgments entered against plaintiffs. The trial court properly set aside the first default judgment that was entered on July 23, 2014, because plaintiffs had already appeared in the action and defendant failed to provide seven days' notice before entry of the default judgment. See MCR 2.603(B)(1)(a)(i) and (b); *Brooks Williamson & Assoc, Inc v Mayflower Const Co,* 308 Mich App 18, 26; 863 NW2d 333 (2014).

After the initial default judgment was set aside, defendant moved again for entry of a default judgment on March 5, 2015. The motion was noticed for hearing on March 12, 2015. Thus, defendant complied with the notice requirement of MCL 2.603(B)(1)(b). In light of the earlier default, and the trial court's denial of plaintiffs' previous motion to set the default aside, when defendant's motion for an entry of a default judgment was filed, the only issue before the court was damages. "[I]t is an established principle that 'a default settles the question of liability as to well-pleaded allegations and precludes the defaulting party from litigating the issue.' " *Kalamazoo Oil Co v Boerman*, 242 Mich App 75, 79; 618 NW2d 66 (2000). However, "[w]hile the question of a defendant's liability is cemented by a default, a defendant has a right to participate where further proceedings are necessary to determine the amount of damages." *Id.* citing *Midwest Mental Health Clinic, PC v Blue Cross & Blue Shield of Mich*, 119 Mich App 671, 675; 326 NW2d 599 (1982). To this end, defendant presented evidence, by affidavit and otherwise, that his contract with plaintiffs provided that he would be compensated a guaranteed amount of $88,000, and that he had already been compensated in the amount of $6,000. In response to defendant's motion, plaintiffs again argued that good caused existed to set aside the entry of the default and that they had a meritorious defense to defendant's counterclaim, but failed to address the issue of damages. Because the default established liability on the contract, and plaintiffs did not challenge the amount of damages requested by defendant, the trial court did not abuse its discretion when it entered the March 16, 2015 default judgment in defendant's favor.

## III. EVIDENTIARY ISSUES

Next, plaintiffs argue, in general, that the trial court erred when it excluded evidence relevant to their defamation claims. We disagree.

We review a trial court's evidentiary rulings for an abuse of discretion. *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004).

The only excluded evidence specifically identified by plaintiffs is proposed Exhibit 21, which appears to be an incomplete chain of e-mails sent by defendant, then forwarded to several different individuals, between August and October 2013. Specifically, plaintiff cites to an e-mail, purportedly sent by defendant about Gater, on October 17, 2013 at 3:20 p.m. The e-mail reads:

> Who does she think she's f***ing with? I am the master! (George this does not apply you.) I about [sic] to take her dreams.

Plaintiffs sought to admit this e-mail into evidence during the testimony of both plaintiff and George Hicks. Defendant objected its admission, asserting that it was not properly authenticated. The trial court agreed and precluded plaintiffs from admitting proposed Exhibit 21. Plaintiffs argue that the foregoing statements were crucial to establishing that defendant acted maliciously and recklessly when he uttered the defamatory statements about plaintiffs. After reviewing the record, we conclude the trial court's exclusion of the evidence was not an abuse of discretion.

Before evidence can be admitted, it must be authenticated. MRE 901(a). "Under MRE 901(a), to authenticate a piece of evidence, the proponent of that evidence bears the burden of bringing forth evidence sufficient to support a finding that the matter in question is what its proponent claims." *Mitchell v Kalamazoo Anesthesiology, PC*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 331959); slip *op at 5* (internal quotation marks and citation omitted). "Indeed, evidence supporting authentication may be direct or circumstantial and need not be free of all doubt." *Id*. (citations omitted).

In this case, plaintiffs asserted that the e-mail was from defendant and about plaintiff. However, there was insufficient indicium of authenticity. Specifically, the court noted that the submitted e-mail chain was incomplete. Chronologically, the e-mail chain appears to be out of order. In addition, plaintiffs' counsel admitted that at one point the chain of e-mails was forwarded to him and he redacted the proposed exhibit in preparation for offering it into evidence. To further complicate the authenticity of the document, plaintiff testified that she received the e-mail from both defendant and George Hicks. The trial court was not satisfied that the document represented a complete unbroken chain of e-mails. Whether a document has been properly authenticated is a matter within the trial court's discretion. *Champion v Champion,* 368 Mich 84, 87-88; 117 NW2d 107 (1962). Under the circumstances that existed in this case, the trial court's exclusion of the evidence was not an abuse of discretion.

Lastly, plaintiffs argue that the trial court erred when it concluded that there were no factual questions for the jury on their conversion claim. However, because plaintiffs failed to include this issue in their statement of the questions presented, it is waived. *Caldwell v Chapman,* 240 Mich App 124, 132; 610 NW2d 264 (2000). In any event, we conclude that plaintiffs' claim lacks merit.

At the close of plaintiffs' proofs, defendant moved for a directed verdict on all of plaintiffs' claims. The trial court granted in part and denied in part defendant's motion.

Specifically, the trial court determined that there was insufficient evidence to present plaintiffs' conversion claim to the jury. We review de novo a trial court's decision on a motion for a directed verdict. *Meagher v Wayne State Univ*, 222 Mich App 700, 708; 565 NW2d 401 (1997). When considering a motion for a directed verdict, a court must consider the evidence in the light most favorable to the nonmoving party and must make all reasonable inferences in favor of the nonmoving party. *Id.* "Directed verdicts are appropriate only when no factual question exists upon which reasonable minds may differ." *Id.*

Because plaintiffs' complaint sought treble damages, it is clear that plaintiffs were asserting a statutory conversion claim pursuant to MCL 600.2919a(1), which provides:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

In *Aroma Wines & Equip, Inc v Columbian Distrib Serv, Inc*, 497 Mich 337, 359; 871 NW2d136 (2015), the Court held that "someone alleging conversion to the defendant's 'own use' under MCL 600.2919a(1)(a) must show that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the objects' ordinarily intended purpose." When plaintiffs rested, there had been no evidence presented that defendant converted any of plaintiffs' personal items, which were to be used as film props, to his own personal use. There was also insufficient evidence from which one could conclude that defendant took any of the money out of the production account and converted it to his own personal use. Because plaintiffs' failed to present evidence during their case-in-chief that would allow a jury to find that defendant converted plaintiffs' property, the trial court did not err when it granted defendant's motion for a directed verdict on plaintiffs' statutory conversion claim.

Affirmed.

/s/ Kathleen Jansen
/s/ Deborah A. Servitto