*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RITA WALSH and GARY WALSH,

      Plaintiffs-Appellees,

v

MARC SAKWA, M.D., JEFFREY ALTSHULER, M.D., and WILLIAM BEAUMONT HOSPITAL,

      Defendants-Appellants,

and

SOUTHEASTERN MICHIGAN CARDIOVASCULAR SURGEONS, PLLC,

      Defendant.

UNPUBLISHED
June 13, 2019

No. 341131
Oakland Circuit Court
LC No. 2016-155529-NH

Before: SAWYER, P.J., and O'BRIEN and LETICA, JJ.

PER CURIAM.

Defendant-appellants (defendants)—Marc Sakwa, M.D. and William Beaumont Hospital[1]—appeal by leave granted[2] an order denying their motion in limine to exclude the testimony of plaintiffs' standard-of-care expert, Dr. Louis Samuels, M.D. We vacate the order and remand for further proceedings consistent with this opinion.

---

[1] Dr. Jeffrey Altshuler is listed as a defendant-appellant, but Dr. Altshuler was dismissed with prejudice by stipulation of the parties on December 15, 2016. Dr. Altshuler is not a party to this appeal, and "defendants" as used in this opinion refers to Dr. Sakwa and Beaumont Hospital.

[2] *Walsh v Sakwa*, unpublished order of the Court of Appeals, entered March 13, 2018 (Docket No. 341131).

-1-

On June 25, 2013, Dr. Sakwa performed a minimally invasive mitral-valve-repair surgery on Rita. During a minimally invasive mitral-valve-repair surgery, the surgeon makes an incision in the side of the patient's chest to access the heart. Once the surgeon has access to the heart, he makes an incision to the left atrium, near the right atrium. A Swan-Ganz catheter runs through the right atrium, and is used to monitor a patient's blood pressure/flow during surgery. The surgeon never sees inside the right atrium, and therefore never sees the Swan-Ganz catheter. After the surgeon finishes repairing the mitral valve, the surgeon has to close the left atrium by suturing it. During Rita's surgery, the Swan-Ganz catheter was apparently sitting in the right atrium near where Dr. Sakwa was suturing the left atrium, and Dr. Sakwa stitched the Swan-Ganz catheter into Rita's heart.

After suturing the left atrium, Dr. Sakwa asked the anesthesiologist to move the Swan-Ganz catheter to ensure that it was not entrapped, and the anesthesiologist reported that the Swan-Ganz catheter moved freely. However, after closing the incision in the side of Rita's chest, the anesthesiologist reported that he was no longer able to move the Swan-Ganz catheter, so Dr. Sakwa had to perform emergency open-heart surgery to free the catheter.

Plaintiffs filed their complaint on October 12, 2016. Plaintiffs alleged two counts. Count 1 alleged medical malpractice against Dr. Sakwa, arguing that he breached the standard of care by suturing the Swan-Ganz catheter into Rita's heart. Count 2 alleged loss of consortium on Gary's behalf as a result of Dr. Sakwa's medical malpractice. Plaintiffs alleged that Beaumont Hospital was vicariously liable for both counts.

In the Affidavit of Merit accompanying the complaint, Dr. Louis E. Samuels stated the standard of care for suturing a Swan-Ganz catheter into the heart during a minimally invasive mitral-valve-repair surgery as follows:

The applicable standard of practice or care in this matter required that Marc Sakwa, M.D. . . .

    a. Refrain from suturing the Swan Ganz catheter into the suture line of the heart;

    b. Properly place sutures into the heart tissue, taking care to avoid placing stitches into or around the Swan Ganz catheter;

    c. Properly identify patient anatomy and the location of the Swan Ganz catheter when suturing the heart;

    d. Properly perform Mrs. Walsh's surgical procedure to avoid suturing the Swan Ganz catheter into the suture line of the heart;

    e. Ensure the Swan Ganz catheter is not sutured into the suture line of the heart before closing the patient;

    f. Any and all other standard of care violations, which may become known throughout the course of discovery in this matter.

During discovery, the parties deposed Dr. Samuels. When asked whether he was "aware that there was a risk of catheter entrapment in a minimally invasive [mitral-valve-repair] procedure," Dr. Samuels responded that "[i]t's something that is so rare that it's not at the forefront of my mind," but he acknowledged that it was something that he "heard about can happen." The following exchange then ensued:

Q. Let me ask you this: The entrapment of the Swan-Ganz in a procedure such as this can happen in the absence of negligence; is that true?

A. No, I don't think so.

Q. Based on what?

A. Well, based on the standard of care of the operation is not to entrap the catheter.

Q. No, I understand that's the ideal, but it happens, correct?

[Objection omitted.]

A. It is not happening within the standard of care would be my answer.

Q. And based on what? Your personal opinion?

A. No, it's not my personal opinion. It's the standard of care of the operation. The catheter should not be entrapped, it should not -- it should not happen in the standard of care.

Q. So what you're then saying is anytime it happens, that in and of itself is negligence?

A. Correct.

Q. Doesn't matter whether -- what the circumstances are, it shouldn't happen and that's just the way it is?

A. Well, in the circumstances of this particular operation, it should not happen under the standard of care.

Q. That's not what I'm asking you. I'm asking you anytime, anyplace, anywhere.

[Objection omitted.]

Q. If somebody accidentally stiches the Swan into the atrium, that's negligence in your mind?

[Objection omitted.]

-3-

*Q*. Professional negligence.

*A*. That is not supposed to happen within the standard of care.

*Q*. That's not what I'm asking you. Is anytime --

*A*. I don't know how --

*Q*. No, it's a yes or no.

*A*. I don't know how to answer that very, very broadly speaking, but it is not supposed to happen ever. It should never happen.

* * *

*Q*. I'm asking you in and of itself by virtue of the fact that that Swan was stitched into the atrium, is that in and of itself evidence of professional negligence?

[Objection omitted.]

*A*. Under the cardiac surgery operation, that is negligence. That catheter should not be sewn into the heart under the cardiac surgery circumstances that we're talking about.

*Q*. So it doesn't matter if it was Dr. Sakwa or any surgeon who stitches that Swan-Ganz in, they've committed negligence in your mind?

*A*. Yes.

*Q*. And where in the literature can you point me to that says that?

*A*. You can't because it is such a rare complication that you're not going to find that written and spelled out in that way. It's understood that that is not within the standard of care to sew a catheter into the heart.

*A*. Because you say it?

*A*. Whether it is --

[Opposing counsel]: Let him finish. Let him finish.

*The Witness*: Whether it is intentional or not, that is not within the standard of care.

*Q*. Are you --

*A*. Whether it is accidental or not, it is not within the standard of care.

Dr. Samuels testified that he only looked at a single article on the subject of Swan-Ganz catheter entrapment. He explained that he did not read any of the articles discussed in the article that he read because that article "did a wonderful job of" describing complications related to the Swan-Ganz catheter and he "didn't feel the need to check the references of [that] article." Dr. Samuels also testified that he did not discuss Swan-Ganz catheter entrapment with any of his colleagues, nor did he attend any meetings, seminars, or presentations about the issue. Dr. Samuels then doubled-down on his conclusion that entrapping the Swan-Ganz catheter was negligence as "a conclusion based on the standards of care of our profession and based upon my review of this particular article."

When pressed again for where he drew his conclusion on the standard of care from, Dr. Samuels testified that suturing the catheter is negligence "because it is not the standard of care; that's why." In attempting to explain why he did not have a conversation about this standard of care with other professionals, Dr. Samuels stated:

> *A.* So this complication, albeit rare, is unintentional, is a complication that resulted from a deviation from the standard of care. I don't think I necessarily even have to have the kind of conversations and things on this kind of a rarity to know that this is a breach of the standard of care and represents malpractice. In our field, having been doing this for decades, it's something that -- please allow me to finish --
>
> *Q.* Yeah.
>
> *A.* It's something that is so obvious that you're not going to find it in a textbook to say you don't sew the catheter into the heart. It's just that -- it's that obvious that you don't do that, that's a deviation from the standard of care. You sew up the heart, you don't sew the catheter with it. You're not going to find that in a textbook. You're not going to find it.

Following discovery, defendants moved to exclude Dr. Samuels' standard-of-care testimony on August 2, 2017. The trial court held a hearing on defendants' motion on October 25, 2017. After listening to the parties arguments, the trial court issued the following ruling:

> The Court finds that the doctor's own level of experience is a weight objection and the doctor has enough to let the jury decide whether or not to accept his opinion, and the Court is of the opinion that the doctor has satisfied MRE 702 and the statute, 600.2955, and may testify. So that's the ruling of the Court.

Defendants now appeal by leave granted.

Defendants argue that the trial court abused its discretion by not excluding Dr. Samuels' standard-of-care testimony. Because we conclude that the trial court's ruling is so lacking that it

effectively precludes our review, we vacate the trial court's order and remand for the trial court to either explain its reasoning or hold a *Daubert*[3] hearing on the issue.

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). A trial court abuses its discretion when it chooses an outcome "outside the range of principled outcomes." *Id*. The admission of evidence because of an erroneous interpretation of the law is necessarily an abuse of discretion. *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004).

At issue here is MRE 702 and MCL 600.2955. MRE 702 states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

And MCL 600.2955 states:

> (1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:
>
> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.
>
> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d) The known or potential error rate of the opinion and its basis.
>
> (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant

---

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

      (f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

      (g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

      (2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

      (3) In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in section 2169.

In *Elher v Misra*, 499 Mich 11; 878 NW2d 790 (2016), our Supreme Court explained that the trial court's role in applying MRE 702 and MCL 600.2955—which codified the United States Supreme Court's opinion in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993)—was not only to act as a gatekeeper to ensure that the jury heard reliable scientific evidence, but to use its discretion to decide how reliability, itself, is determined:

> The United States Supreme Court has recognized . . . that the *Daubert* factors may or may not be relevant in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of the expert's testimony. And even though the United States Supreme Court has stated that, in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," the Court has also stated that even in those cases, the *Daubert* factors can be helpful, even if all of the factors may not necessarily apply in determining the reliability of scientific testimony. Accordingly, it bears repeating that it is within a trial court's discretion how to determine reliability. [*Elher*, 499 Mich at 24-25 (footnotes omitted).]

The *Elher* Court went on to explain that "all the factors in MCL 600.2955 may not be relevant in every case." *Id*. at 27.

Here, the trial court's failure to explain *how* it determined that Dr. Samuels' testimony was reliable—that is, how the testimony satisfied MRE 702 and MCL 600.2955—effectively prevents this Court from reviewing the issue. MCL 600.2955(1) lists seven factors that courts must consider, and as explained in *Elher*, not all of those factors are always relevant, and there may even be times when none of the factors are relevant. The trial court clearly considered MCL 600.2955 satisfied, but it never explained how. And because the trial court failed to explain how MCL 600.2955 was satisfied, this Court cannot discern which factors listed in MCL 600.2955(1), if any, the trial court believed were applicable, and we therefore cannot determine whether the trial court abused its discretion by relying on those factors—assuming that any factors applied. Perhaps more problematic, there is no suggestion in the trial court's ruling that it

even considered the factors listed in MCL 600.2955(1), which it was required to do by the statute's plain language. See MCL 600.2955(1) (stating that the court "*shall* consider all of the following factors") (emphasis added).

The trial court's failure to address which factors listed in MCL 600.2955(1) that it relied on when rendering its decision makes this Court's review of the parties' arguments on appeal futile. For instance, the parties argue over whether Dr. Samuels' testimony was supported by peer-reviewed medical literature. See MCL 600.2955(1)(b). But the trial court never stated or otherwise implied that it was relying on MCL 600.2599(1)(b) to conclude that Dr. Samuels' testimony was reliable, so deciding whether that factor is satisfied is premature. Similarly, the parties dispute whether Dr. Sakwa, in his deposition testimony, agreed with Dr. Samuels' proposed standard of care, and whether this establishes that Dr. Samuels' opinion was "generally accepted within the relevant expert community." MCL 600.2599(1)(e). But with this too, the trial court never stated or otherwise implied that it was relying on MCL 600.2599(1)(e) to conclude that Dr. Samuels' testimony was reliable, so deciding whether the factor is satisfied neither supports nor contradicts the trial court's decision.[4]

In sum, MCL 600.2955(1) is clear: "the court . . . *shall* consider" the seven factors listed. (Emphasis added.) The trial court's opinion here is so lacking that it is impossible to determine whether the trial court considered the factors listed in MCL 600.2955(1). And even if it did consider those factors, it is unclear which of those factors the trial court found applicable and why. This makes our review of this case—as well as our review of the parties' arguments— virtually impossible. We therefore conclude that the trial court necessarily abused its discretion because, based on the trial court's ruling, it appears that it did not consider the factors listed in MCL 600.2955(1), which it was required to do by law. See *Craig*, 471 Mich at 76. Rather than reversing the trial court's order, we vacate the order and remand for the trial court to either explain its reasoning for why Dr. Samuels' testimony was reliable—being sure to address which factors listed in MCL 600.2955(1), if any, apply to this case and why—or, in its discretion, hold a *Daubert* hearing as was originally requested by defendants, and then issue an opinion explaining whether Dr. Samuels' testimony is reliable under MRE 702 and MCL 600.2955.

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Colleen A. O'Brien
/s/ Anica Letica

---

[4] Moreover, the parties disputed at trial—and continue to dispute on appeal—whether Dr. Sakwa actually agreed with Dr. Samuels' standard-of-care testimony, and the trial court never resolved that disagreement.