*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KATHLEEN ELKINS, personal representative of the
ESTATE OF LARRY THOMAS,

       Plaintiff-Appellant,

v

RAJAGOPALAN RAJARAMAN, MD, and
RAJAGOPALAN RAJARAMAN, LLC

       Defendants-Appellees.

UNPUBLISHED
June 11, 2020

No. 346417
Wayne Circuit Court
LC No. 17-001995-NH

Before: LETICA, P.J., and STEPHENS and O'BRIEN, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order granting summary disposition to defendant.[1] This is a medical malpractice case concerning defendant's treatments of Larry Thomas. Thomas went to see defendant, an otolaryngologist (ear, nose, and throat doctor), complaining of a blocked left ear. Defendant examined Thomas and was unable to find anything wrong, so he ordered Thomas to get a CT scan and bring the images back to defendant. Thomas refused to get the CT scan. Almost a year later, Thomas was diagnosed with nasopharyngeal cancer. It is undisputed that had Thomas gotten the CT scan when defendant first ordered it, Thomas's cancer could have been discovered. On appeal, plaintiff argues that defendant breached the standard of care by not telling Thomas that a CT scan was necessary to rule out possible serious conditions like cancer, and that there is evidence that, had defendant not breached this standard of care, Thomas would have gotten the CT scan. Unfortunately for plaintiff, her standard-of-care expert never testified that defendant had a duty to inform Thomas that a CT scan was necessary to rule out cancer or other serious conditions. When reviewing the standard of care actually articulated by plaintiff's expert, defendant clearly did not breach that standard of care. This appeal has been decided without oral argument pursuant to MCR 7.214(E). We affirm.

---

[1] The parties entered a stipulated order dismissing Rajagopalan Rajaraman, LLC from the case, so "defendant" as used in this opinion refers only to Rajagopalan Rajaraman, M.D.

## I. BACKGROUND

Thomas visited defendant's office on August 1, 2014, complaining that his left ear had been blocked for a month, and that his right ear was "starting to get blocked." Defendant examined plaintiff's right nasal cavity but did not notice any abnormalities. Defendant's assessment was "Otitis media," "Allergic rhinitis," a deviated septum, and sleep apnea, and he ordered Thomas to get a CT scan of his sinuses and "follow up with images."

Thomas testified that when he found out that the CT scan would cost $4,000, he was "like, well, I can't get the CAT scan at this time because I can't afford $4,000 right now." But he also testified that defendant never told him that the CT scan was needed to rule out potentially serious conditions like cancer, and that, had defendant done so, Thomas "would have got the money somehow," like by reaching out to friends and family.

Thomas followed up with defendant on August 20, 2014, without the CT scan. At that visit, defendant discussed with Thomas a bilateral myringotomy and tubes (placing tubes in both ears) and septoplasty (correcting a deviated septum), but plaintiff only wanted the bilateral myringotomy and tubes. Defendant performed the bilateral myringotomy and tubes on September 8, 2014, but Thomas's problems eventually returned.

Over the next few months, Thomas saw various doctors complaining of ear pain, headaches, and facial pain. On June 12, 2015, at Thomas's second visit to the emergency room, Benjamin Glasener, M.D. ordered a CT scan and found a "[d]iffuse pattern of mucosal thickening involving the maxillary" and "[m]oderate deviation of the nasal septum to the left of midline with bony spur projecting toward the left." Dr. Glasener ordered Thomas to follow-up with an otolaryngologist.

Thomas visited otolaryngologist Gregory Stephens, D.O. on July 23, 2015. Dr. Stephens noted a mass that had developed on the roof of Thomas's mouth, and biopsied the mass on August 4, 2015. The result of that biopsy showed a "[w]ell differentiated squamous cell carcinoma," and Thomas was ultimately diagnosed with nasopharyngeal cancer. Unfortunately, Thomas eventually passed away as a result of the cancer.

Plaintiff, representing Thomas's estate, sued defendant, alleging that he committed medical malpractice by, among other things, failing to recognize that plaintiff's symptoms were indicative of possible cancer and "to perform and/or order diagnostic tests" accordingly.[2]

In response to some of plaintiff's factual assertions, defendant asserted that he recommended additional treatments and tests to address Thomas's pain, but Thomas refused. Defendant "denied that [he] was professionally negligent in the treatment care and treatment of"

---

[2] Thomas died roughly nine months after the complaint was filed, but gave a deposition before his unfortunate passing. After Thomas's death, plaintiff stated an intent "to amend[] the complaint to add a wrongful death claim," but there is no amended complaint in the lower court record.

Thomas, and further "denied that any alleged act or failure to act by [defendant] proximately caused [Thomas] to sustain injury or damage."

During discovery, plaintiff's standard-of-care expert, Dr. Michael Morris, testified that had Thomas consented to the septoplasty and CT scan when he first visited defendant, it would have revealed Thomas's cancer. Similarly, plaintiff's expert Dr. Gerald Sokol testified as follows:

> *Q*. And would you agree with Doctor Morris that if Mr. Thomas had gotten the CT of the sinuses that my doctor ordered on him in August of 2014 it may have shown something that could have led to an earlier diagnosis?
>
> *A*. It's conceivable.
>
> *Q*. And if Mr. Thomas had agreed to undergo the septal surgery that my client recommended it might have allowed access for Doctor Raja to see something that would have led to an earlier diagnosis?
>
> *A*. It might have.

Eventually, defendant moved for summary disposition. Defendant argued that plaintiff failed to establish that any of defendant's actions were the cause of Thomas's injuries. Defendant argued that he could not be the cause-in-fact of Thomas's injuries because he recommended a CT scan and a procedure—a nasal septoplasty—that plaintiff's experts agreed could have diagnosed Thomas's cancer had Thomas decided to get them. Defendant concluded that it was Thomas's failure to follow defendant's recommendations that was the cause-in-fact of Thomas's injuries.

In response, plaintiff argued that causation was not an issue because, according to plaintiff, defendant's breach of the standard of care was not failing to order the CT scan but failing to inform Thomas of *the reason* for ordering the CT scan. Plaintiff explained that based on Thomas's testimony, there was evidence that had defendant told Thomas the reason for getting the CT scan, Thomas would have found the money and gotten the CT scan, and defendant would have discovered the cancer. Plaintiff concluded that causation was clearly met because but for defendant's failure to inform Thomas of the reason for ordering the CT scan, Thomas's cancer would have been discovered sooner.

At a hearing on September 19, 2018, the trial court granted defendant's motion, concluding that plaintiff could not establish causation. This appeal followed.

## II. STANDARD OF REVIEW

Appellate courts review de novo a trial court's grant of summary disposition. *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 506; 885 NW2d 861 (2016). Defendant moved for summary disposition under MCR 2.116(C)(10). In *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999), our Supreme Court explained the process for reviewing a motion filed under MCR 2.116(C)(10):

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this

-3-

subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law.

A genuine issue of material fact exists when, after viewing the evidence in a light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

## III. ANALYSIS

"In order to establish a cause of action for medical malpractice, a plaintiff must establish four elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).

Plaintiff argues that defendant owed Thomas a duty "to explain the reasons for ordering a particular diagnostic test, including the potentially life-threatening conditions that the test is intended to screen for," and that defendant breached that duty by not telling Thomas that he needed a CT scan so that defendant could rule out cancer or other potentially serious conditions. Plaintiff relies on the following excerpt from Dr. Morris's testimony to support her stated standard of care:

> *Q*. Okay. Is it sufficient for an ENT physician to say, I'd like you to get the CT scan to assist me in the diagnosis as to what may be going on with you? Is that a good enough reason for an educated adult to get a CT scan?
>
> *A*. If you characterize the problem that you're dealing with as unresponsive to all the medical therapy that the patient had that you're also duplicating and as a consequence of no changing occurred [sic] and you having fluid in your ear, I would mention those things to the patient too.
>
> And I also know that you have to document, document, document a lack of responsiveness to medical therapy in order to justify the CT scan or additional procedures.
>
> *Q*. Do you remember what my question was?
>
> *A*. Yes. Is it enough just to tell a patient I'd like you to get a CT scan.
>
> *Q*. To assist in the diagnosis since you're not responding to these therapies, since I'm getting -- I need some answers. Is it enough to tell an educated, adult male, please get a CT scan to assist me in the diagnosis?
>
> [Objection omitted]

*A*. I would agree that if a doctor documents in his record and tells the patient what he's documenting, that I need to assist in diagnosing this problem that hasn't responded to any medical therapy because there may be something else causing this problem, yes, I think that's enough.

Based on the foregoing, it is clear that Dr. Morris did not testify that a doctor owes a patient a duty to inform the patient that a test is needed to rule out potentially serious conditions. Instead, Dr. Morris testified that a doctor satisfies the standard of care if the doctor tells the patient that a test is needed "to assist in diagnosing" a problem that the doctor has been otherwise unable to diagnose.

There is no genuine issue of material fact that defendant satisfied this standard of care. Thomas testified that defendant told him a CT scan was necessary because defendant "didn't really see nothing" in the other tests that could explain Thomas's problems. Likewise, defendant testified that he discussed with Thomas that a CT scan was needed to diagnose the cause of Thomas's problems. When viewing the evidence in the light most favorable to plaintiff, there is simply no evidence that defendant failed to tell Thomas that the CT scan was needed to assist defendant in diagnosing Thomas's otherwise undiagnosed problem. Thus, there is no genuine issue of material fact that defendant did not breach the standard of care articulated by Dr. Morris.[3]

Affirmed.

/s/ Anica Letica
/s/ Cynthia Diane Stephens
/s/ Colleen A. O'Brien

---

[3] While Thomas testified that defendant never told him that a CT scan was needed to rule out potentially serious conditions such as cancer, that is not relevant to the standard of care articulated by Dr. Morris. According to Dr. Morris, so long as defendant told Thomas that he needed the CT scan "to assist in diagnosing this problem that hasn't responded to any medical therapy," defendant satisfied the standard of care.