*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WESLEY CHARLES,

        Plaintiff-Appellant,

v

TRINITY HEALTH-MICHIGAN, doing business as
ST. MARY MERCY LIVONIA, MENDELSON
ORTHOPEDICS, P.C., doing business as
MENDELSON-KORNBLUM-ORTHOPEDIC &
SPINE SPECIALISTS, and JEFFREY
MENDELSON, M.D.,

        Defendants-Appellees.

UNPUBLISHED
February 20, 2025
10:48 AM

No. 369009
Wayne Circuit Court
LC No. 21-014061-NH

Before: LETICA, P.J., and GARRETT and FEENEY, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff, Wesley Charles, appeals from the order dismissing his case against defendant Trinity Health-Michigan (Trinity) (doing business as St. Mary Mercy Livonia). Although plaintiff appeals from the order dismissing Trinity, plaintiff is challenging the order granting summary disposition to defendants Mendelson Orthopedics, P.C. (doing business as Mendelson-Kornblum-Orthopedic & Spine Specialists) and Dr. Jeffrey Mendelson, M.D. (Dr. Jeffrey) (collectively, Mendelson defendants) under MCR 2.116(C)(10) (no genuine issue of material fact). On appeal, plaintiff argues the trial court erred by granting summary disposition because there was a genuine issue of material fact whether Dr. Jeffrey Mendelson was the proximate cause of his injuries.[1] We reverse.

---

[1] Plaintiff also argues the trial court improperly granted summary disposition to Mendelson defendants because they failed to properly preserve their affirmative defense of comparative negligence, and the question of whether plaintiff was unreasonable for declining exploratory surgery was a question for the jury. Because Michigan follows the "raise or waive" rule of

-1-

## I. BACKGROUND

In May 2019, plaintiff underwent knee surgery at Trinity. The surgery was performed by Dr. Jeffrey's brother, Dr. David Mendelson, M.D. (Dr. David). As part of the surgery, a catheter was inserted into plaintiff's right knee to administer pain medicine. Plaintiff's knee surgery was successful and, in preparation for discharge home, a nurse attempted to remove plaintiff's catheter. As she pulled, the catheter snapped, leaving about two inches of catheter protruding from plaintiff's leg. The nurse paged a physician's assistant to assist with the removal of plaintiff's catheter. After the physician's assistant failed to remove the catheter, she went to get help. Dr. Jeffrey, who had never treated plaintiff, was summoned to his room and attempted to remove the catheter. Unfortunately, the catheter snapped again during removal. In his notes, Dr. Jeffrey indicated that after the snap, he "felt as if we had gotten the entire catheter out, but I am not certain." Dr. Jeffrey ordered an x-ray "as the catheter had a radio marker and [the x-ray] would be able to confirm whether or not [any remnants of the catheter] remained underneath the tissue. The x-ray results did not show that there was any part of the catheter remaining in plaintiff's leg."[2]

In June 2019, plaintiff sought treatment from his primary care doctor, Dr. Bruce Cicone, M.D., regarding discomfort in his leg. Plaintiff reported that "he feels something in there," but acknowledged that he did not mention this at a follow-up visit at Mendelson Orthopedics in May 2019. Dr. Cicone did not observe any increased redness, swelling, decreased range of motion, or any other symptoms, but recommended that plaintiff "call his orthopedic surgeon's office to discuss concerns of a retained foreign body in the right knee." Plaintiff subsequently returned to Mendelson Orthopedics in July 2019, complaining of discomfort where the catheter was inserted. Dr. David told plaintiff that it was possible part of the catheter remained in his leg, but he could live with any catheter remnants in his leg if it did not bother him. He was also offered "surgical exploration to see if we can remove the bit of catheter that may still be remaining," but plaintiff declined the surgical intervention.

Over the next few months, plaintiff's pain persisted, and Dr. Cicone ordered an ultrasound in September 2019. The ultrasound revealed "an approximately 8cm linear echogenic structure located within the subcutaneous tissues approximately 9mm deep to the skin surface, the appearance is suggestive of a tubular foreign body." In October 2019, plaintiff underwent a procedure to remove the catheter. During the procedure, "[a]pproximately 25cm of catheter was

---

appellate review, *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289; 47 NW3d 472 (2023), and plaintiff failed to raise these arguments before the trial court, they are waived and we decline to consider them.

[2] Because the catheter did not show up on the x-ray, it is unclear whether it did, in fact, have a radiopaque marker or strip. Moreover, there is a black tip on the catheter which indicates the end of the catheter and that black tip had not been removed at that time.

removed" from plaintiff's leg. But despite this removal, plaintiff's pain remained, and he had begun to develop scar tissue in the area where the catheter was.[3]

In October 2021, plaintiff commenced his medical malpractice suit against defendants claiming that he suffered injuries as a result of Dr. Jeffrey's negligence. Plaintiff claimed, in relevant part, that Dr. Jeffrey failed to "order and complete an ultrasound instead of and/or in addition to x-ray imaging" both during the initial removal and subsequent appointments. Plaintiff claimed that by failing to adhere to the applicable standards of care, Dr. Jeffrey was the direct and proximate cause of his "pain and injury at the catheter retention site." Plaintiff also argued that because Dr. Jeffrey was an agent or employee of Trinity and Mendelson Orthopedics, they were vicariously liable for his injuries. Attached to plaintiff's complaint was an affidavit of merit from Dr. Raymond M. Vance, M.D., an orthopedic surgeon qualified as an expert witness for medical malpractice actions. According to Dr. Vance, Dr. Jeffrey did not adhere to the applicable standard of care when treating plaintiff because he failed to "properly remove the catheter in its entirety . . . without using excess force, order the correct form of imaging to identify a retained piece (an Ultrasound), and otherwise timely remove the retained catheter piece." As a result, plaintiff "suffered retention of at least 25 cm of retained catheter resulting in discomfort, pain, and the need for a procedure to remove it." Mendelson defendants answered, denying plaintiff's allegations as untrue.

After nearly two years of discovery and settlement negotiations, Mendelson defendants moved for summary disposition under MCR 2.116(C)(10).[4] Mendelson defendants argued that plaintiff could not establish proximate cause because the evidence did not show that but for Dr. Jeffrey's failure to order an ultrasound, plaintiff would not have needed surgery to remove the catheter. Nor could plaintiff establish that the catheter would have been removed sooner had Dr. Jeffrey ordered the ultrasound after the initial removal attempts. Plaintiff responded, claiming

---

[3] Plaintiff had subsequent swelling and pain in the same leg, and an additional 1cm piece of catheter was surgically removed from his leg in June, 2022.

[4] Mendelson defendants also filed a motion for partial summary disposition, claiming that despite alleging multiple standard of care violations against Dr. Jeffrey, the only standard of care violation Dr. Vance's testimony identified was that Dr. Jeffrey was required and failed to order an ultrasound after the initial removal attempt. Because no other breaches alleged by plaintiff were supported by the evidence, Mendelson defendants requested the trial court dismiss plaintiff's unsupported allegations. After granting summary disposition to Mendelson defendants on the basis of proximate cause, the trial court found, "[t]here's no need for the Court to rule on the second motion for summary disposition."

We also note that Trinity also moved for summary disposition under MCR 2.116(C)(10), claiming that it was not vicariously liable for Dr. Jeffrey's action because there was no evidence that he was an agent of Trinity. Although the trial court did not decide Trinity's motion, when granting summary disposition to Mendelson defendants on the basis of proximate cause, the court found that its "reasoning would also imply that plaintiff's claim against the other defendants would also fail 'cause [sic] their liability is vicarious to that of defendant Mendelson." Accordingly, plaintiff's claims against Trinity were dismissed with prejudice.

there was a genuine issue of material fact whether Dr. Jeffrey's failure to order an ultrasound after the initial removal attempts was a proximate cause of plaintiff's injuries. Plaintiff asserted that Dr. Jeffrey knew or should have known the attempts to remove the catheter were unsuccessful, and he should have ordered an ultrasound. Had Dr. Jeffrey ordered an ultrasound and properly informed Dr. David of the possibility of the retained catheter, plaintiff "would have learned of the retained catheter sooner, had it removed sooner, and would not have suffered the initial several months of pain, discomfort, and scar tissue."

The trial court granted summary disposition to Mendelson defendants, finding that, even viewing the evidence in the light most favorable to plaintiff, he could not "establish that, but for Dr. Jeffrey Mendelson's alleged failure to order an ultrasound, the retained catheter would have been removed sooner." Plaintiff moved for reconsideration, claiming the trial court "misapprehended the gravamen of Plaintiff's claim and related proximate causation." The trial court denied plaintiff's motion, finding that plaintiff "failed to demonstrate a palpable error by which the Court and the parties have been misled or show that a different disposition of the motion must result from correction of an error to warrant reconsideration or hearing." This appeal followed.

## II. STANDARD OF REVIEW

The grant or denial of summary disposition is reviewed by this Court de novo. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 229; 964 NW2d 809 (2020). That means we review the issue independently, with no required deference to the trial court. *Millar v Constr Code Auth*, 501 Mich 233, 237; 912 NW2d 521 (2018). When deciding a motion under MCR 2.116(C)(10), the trial court "must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil v Oakwood Healthcare Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). If the moving party properly asserts and supports its motion for summary disposition, the "burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The trial court must only grant summary disposition under MCR 2.116(C)(10) "when there is no genuine issue of material fact," meaning that the record does not leave "open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (citation omitted).

## III. ANALYSIS

Plaintiff argues the trial court improperly granted summary disposition to Mendelson defendants because there was a genuine issue of material fact whether Dr. Jeffrey's failure to order an ultrasound was the proximate cause of his injuries. We agree.

"In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." MCL 600.2912a(2).

> To establish a cause of action for medical malpractice, a plaintiff must establish four elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries

-4-

were the proximate result of the defendant's breach of the applicable standard of care. [*Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012).]

"Failure to establish any one of these four elements is fatal to a plaintiff's medical malpractice suit." *Benigni v Alsawah*, 343 Mich App 200, 213; 996 NW2d 821 (2022). At issue in this case is whether plaintiff established Dr. Jeffrey's actions were the proximate cause of his alleged injuries.

The element of proximate cause encompasses both cause in fact and legal cause. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). Cause in fact "generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994) (citations omitted).

Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation. All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Summary disposition is not appropriate when the plaintiff offers evidence that shows that it is more likely than not that, but for defendant's conduct, a different result would have been obtained. [*Ykimoff v WA Foote Mem Hosp*, 285 Mich App 80, 87; 776 NW2d 114 (2009) (quotation marks and citations omitted).]

A plaintiff must establish causation by setting forth "specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Skinner*, 445 Mich at 174. In a medical malpractice case, "[e]xpert testimony is essential to establish a causal link between the alleged negligence and the alleged injury." *Pennington v Longabaugh*, 271 Mich App 101, 104; 719 NW2d 616 (2006). This testimony must draw "a causal connection between the defendant's breach of the applicable standard of care and the plaintiff's injuries." *Craig*, 471 Mich at 90.

According to plaintiff, Dr. Jeffrey assured Dr. David that he had taken appropriate steps to resolve the issues with plaintiff's catheter. As a result, Dr. David chose not to order an ultrasound during the follow-up appointment with plaintiff and only discussed the option of surgically removing any possibly remaining catheter if it bothered plaintiff. Plaintiff asserts that had Dr. Jeffrey ordered an ultrasound and properly informed Dr. David of the possibility of the retained catheter, he "would have learned of the retained catheter sooner, had it removed sooner, and would not have suffered the initial several months of pain, discomfort, and scar tissue."

In support of his claim, plaintiff relies on the testimony of his medical expert, Dr. Vance. Dr. Vance testified that Dr. Jeffrey knew or should have known that the entire catheter had not been removed from plaintiff's leg. Specifically, Dr. Vance testified as follows in his deposition:

[Y]ou have to recall that Dr. Mendelson was aware of an increase in resistance to removing the device, was aware of what appeared to be some snapping of the device

at the time he made an effort to remove it, and knew or should have known that the black tip of the catheter didn't come out or that the other 25 centimeters of the catheter didn't come out. So I don't know that it's reasonable in the setting of that information to rely on an x-ray as the sole basis to conclude that there was no retained catheter.

As such, it was unreasonable for Dr. Jeffrey to rely solely on the x-ray to determine that there was no catheter remaining in plaintiff's leg, and Dr. Jeffrey should have ordered an ultrasound to visualize any remaining catheter. Dr. Vance claimed that Dr. Jeffrey's failure to order an ultrasound caused the catheter to unnecessarily remain in plaintiff's leg for months, producing pain and possibly contributing to the formation of more scar tissue. Dr. Vance's testimony suggests that plaintiff's pain would not have occurred but for Dr. Jeffrey's failure to order the ultrasound:

> Q. And based on your prior testimony, I'll go out on a limb and assume you believe the standard of care required Dr. Mendelson to order an ultrasound?
>
> A. I think that would have been a very reasonable thing to do. Yes, sir.
>
> Q. Do you believe it was a breach of the standard of care not to order an ultrasound?
>
> A. If he had taken the catheter out without ordering an ultrasound, I would not be critical.
>
> Q. Okay.
>
> A. But the failure to get an ultrasound in this setting led to the device remaining in place for a period of a couple of months, which was not necessary.
>
> Q. Okay. So correct me if I'm wrong. The only difference that would have occurred in this case, had Dr. Jeffrey Mendelson complied with the standard of practice, would have been the residual catheter would have been removed approximately four to five months earlier?
>
> A. Yes.

But the record also shows that after the attempted removal, Dr. Jeffrey informed Dr. David that there were issues removing the catheter and he was not uncertain whether "he had gotten it all out or not." Despite this, Dr. David "wasn't concerned that anything needed to be done prior to [plaintiff's] discharge, including the possibility of a retained foreign object." While Dr. Vance testified that he did not know whether the standard of care required Dr. Jeffrey to surgically remove the catheter after the initial removal attempts, he nevertheless believed that an ultrasound was necessary to fully assess the situation.

Further, during plaintiff's July 2019 follow-up appointment, Dr. David was fully aware that plaintiff might have some scar tissue and residual catheter in his leg. Although Dr. David believed any remaining catheter "was benign and [plaintiff] could live with it, if it doesn't bother him," he offered to conduct exploratory surgery to determine whether any catheter remained and

-6-

remove it. But plaintiff declined, and the catheter was not removed until months later after plaintiff reported an increase in his pain. But had an ultrasound been presented to plaintiff as an alternative to exploratory surgery (or, at least, as an initial noninvasive first step), plaintiff, a Jehovah's Witness, may well have taken that alternative and then would have been in a better position to decide regarding surgery to remove the catheter remnant versus the "wait and see" option.

Even knowing that it was likely parts of the catheter remained in plaintiff's leg, Dr. David still declined to remove it during the follow-up appointment. Dr. David even asserted that if "Dr. Jeffrey Mendelson ordered an ultrasound on the patient's catheter site [i]n May [] 2019 and that ultrasound determined the presence of catheter, I would not have removed the catheter based on the patient's lack of complaints expressed to me during his postoperative course."

But this creates a credibility question for the jury to resolve. It is easy after the fact for the physician to say that he would not have done anything differently even if he had known the true facts at the time. And, perhaps even more importantly, it discounts what the patient would have decided regarding the exploratory surgery. That is, plaintiff declined the surgery and waited until the problem developed based upon the limited knowledge that there might have been some catheter piece remaining in his leg. That is not the same as knowing that there was a 25 cm piece of catheter remaining in his leg.[5] Simply put, had it been determined at the time that 25 cm of catheter was unaccounted for, which Dr. Vance was critical of Dr. Jeffrey not determining, plaintiff may have opted for a different course of treatment—i.e., insisting on quick surgical removal rather than a "wait and see" position.

In sum, what is known is that a significant amount of the pain-pump catheter was retained in plaintiff's leg. It did not show up on x-ray, although Dr. Jeffrey remained concerned that not all of the catheter had been removed. While there were medical reasons for ordering the x-ray as it would show aspects of the knee that an ultrasound would not, it is clear from the events that had an ultrasound also been ordered, it would have disclosed the retained partial catheter; indeed, plaintiff's medical records reflect that subsequent ultrasounds revealed the presence of the retained catheter leading to the surgeries to remove it. Furthermore, plaintiff's expert is of the opinion that an ultrasound should have been performed.

We do not suggest that it is a certainty that a jury would conclude that Dr. Jeffrey committed malpractice resulting in plaintiff's additional pain and suffering. But we are convinced that plaintiff has sufficient evidence of such that merits presentation to a jury for the jury to make that determination. Accordingly, the trial court erred in granting summary disposition and dismissing plaintiff's case.

---

[5] We are also at a loss to understand why it was not readily apparent at the time of the initial removal of the catheter that a significant portion remained in plaintiff's leg simply by comparing the length of the portion of the catheter that was removed to the original length catheter used.

Reversed and remanded for further proceedings consistent with the opinion. We do not retain jurisdiction. Plaintiff may tax costs.

/s/ Kristina Robinson Garrett
/s/ Kathleen A. Feeney